## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PATRICIA ROEBUCK,<br><br>                              Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.; and EQUIFAX INFORMATION SERVICES, LLC<br><br>                              Defendants. | **Case No.:** 2:26-cv-10372<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>    1. **FCRA, 15 U.S.C. § 1681,** *et seq.* |

Plaintiff Patricia Roebuck, ("Plaintiff") through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* against Experian Information Solutions, Inc. ("Experian") and Equifax Information Services, LLC ("Equifax") (referenced collectively as "Defendants").

### <u>INTRODUCTION</u>

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

1

2.      Unfortunately, however, this information has also become readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, Defendants acknowledge this potential for misuse and resulting damage every time they sell their credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system,

2

and unfair credit reporting methods undermine the public confidence which
is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment
> of all sorts of computerized data banks, the individual is in great danger
> of having his life and character reduced to impersonal "blips" and key-
> punch holes in a **stolid and unthinking machine which can literally
> ruin his reputation without cause, and make him unemployable or
> uninsurable, as well as deny him the opportunity to obtain a
> mortgage or buy a home**. We are not nearly as much concerned over the
> possible mistaken turn-down of a consumer for a luxury item as we are
> over the possible destruction of his good name without his knowledge
> and without reason. Shakespeare said, the loss of one's good name is
> beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) (*quoting* 116 Cong. Rec. 36570 (1970))

(emphasis added).

8.      In light of these important findings and purposes, Congress specifically noted

"a need to insure that [CRAs] exercise their grave responsibilities with fairness,

impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. 1681(a)(4).

9.      Plaintiff's Complaint arises out of Defendants' blatantly inaccurate credit

reporting, wherein Defendants reported to Plaintiff's potential creditors that Plaintiff owed

money on tradelines that Plaintiff is no longer legally responsible for.

10.     Accordingly, Plaintiff brings claims against Defendants for failing to follow

reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit

reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

14.     Plaintiff is a natural person residing in Highland, Michigan, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

16.     Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Defendant is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose

of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, Georgia, 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

17.     Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore consumer reporting agencies ("CRAs") as defined by 15 U.S.C. § 1681a(f) of the FCRA.

18.     During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

19.     During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, directors, representatives, and/or insurers.

20.     Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

21.     Defendants did not maintain procedures reasonably adapted to avoid any such violations.

### FACTUAL BACKGROUND
### Summary of the Fair Credit Reporting Act

22.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

23.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

24.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *See* 15 U.S.C. § 1681(b).

25.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

26.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

### Defendants' Processing of Credit Information

27.    Defendants, two of the three major CRAs in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

28.    Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29.    Defendants obtain consumer information from various sources. Some consumer information is sent directly to Defendants, and other information must be independently gathered by Defendants, or acquired from third party providers, vendors or repositories, such as computerized reporting services like PACER or Lexis-Nexis.

30.     Defendants also obtain information from other CRAs (who commonly share information).

31.     Defendants regularly seek out and procure consumer bankruptcy filing and discharge information on a daily basis with the intention of including it in the consumer reports Defendants sell to third parties for a profit.

32.     The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

33.     The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendants' reports.

34.     The information Defendants include in consumer reports contributes to a consumer's overall creditworthiness and determines his or her FICO Score.

35.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of his or her creditworthiness.

36.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

37. Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by Defendants in their consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

38. A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is.

39. Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

40. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

41.     A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account was accurately reporting as having a zero-dollar balance.

42.     Defendants are well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged; both such exceptions are rare and furthermore identified on the individual consumer's bankruptcy docket sheet.

43.     Additionally, in or around 2009, Defendants implemented their own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols.*, No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

44.     The *White* settlement makes clear that the CRAs know or should know that pre-petition, unsecured consumer debts are typically discharged in Chapter 7 proceedings. *Benjamin v. Experian Info. Solutions*, 561 F. Supp. 3d 1330, 1340 (citing *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d at 769).

45.     Defendants' bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7 bankruptcy, even when the furnisher does not update the accounts as discharged.

46.     In other words, Defendants' automated bankruptcy scrub assumes Defendants' notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition

accounts may be reporting inaccurately, and Defendants will overwrite data reported by a furnisher according to their assumptions and algorithms.

47.     However, Defendants have intentionally chosen to disregard knowingly inaccurate open balance and payment obligations of certain types of pre-bankruptcy accounts in Defendants' software programming of their automated "bankruptcy scrub" that they have been employing for well over a decade.

48.     Defendants also know that it is rare for a pre-petition debt to be reaffirmed, or successfully challenged in an adversary proceeding.

49.     Further, Defendants know that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket, as is required by bankruptcy law.

50.     Additionally, information indicating that a specific debt has not been discharged, but instead was reaffirmed or successfully challenged through an adversary proceeding, is retrieved from the same sources from which Defendants independently obtain consumer bankruptcy case information.

51.     Defendants also receive information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

52.     However, Defendants regularly report inaccurate information about consumers who have received a Discharge Order.

53.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendants frequently report information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

54.     Defendants regularly publish consumer information that conflicts with information: provided by data furnishers to Defendants, already included in Defendants' credit files, contained in public records that Defendants regularly access, and/or sourced through Defendants' independent and voluntary efforts.

55.     Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

56.     Defendants routinely report inaccurate, and materially misleading information about consumers like Plaintiff, without verifying or updating the information as required by § 1681e(b), despite possessing information inconsistent with the reported information that establishes the reported information is inaccurate.

57.     Defendants' unreasonable policies and procedures cause them to regularly report consumer information without verifying its accuracy.

58.     Defendants' unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

59.     Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendants' own files.

60.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

61.     Thus, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures, which cause Defendants to report inaccurate balances, account statuses, payment histories, and/or payment statuses.

**Allegations Specific to the Credit Reporting of Plaintiff**

62.     Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about November 19, 2024, in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 24-50985-prh).

63.     Plaintiff received an Order of Discharge on or about March 18, 2025.

64.     Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

65.     Defendants each prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

66.     Defendants reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

67.     However, Defendants failed to report Plaintiff's consumer bankruptcy information in the Public Records section and/or in one or more individual tradelines of Plaintiff's consumer reports.

68.     Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through

13

bankruptcy," and with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

69. Defendants should have reported **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance, but did not.

70. Instead, Defendants each reported at least one account with an inaccurate account status, payment history, and/or outstanding balance.

**Inaccuracies in Plaintiff's Consumer Reports**

71. On or about May 02, 2025, Plaintiff obtained copies of her Experian and Equifax credit reports.

72. Upon review of her credit reports, Plaintiff observed inaccuracies.

73. As a preliminary matter, Defendants did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

74. The name, social security number, and address in Plaintiff's Chapter 7 petition match the information listed on her Defendants consumer reports.

75. Defendants failed to report Plaintiff's bankruptcy discharge even though Defendants had all the correct personal information for Plaintiff in their databases which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

76. Notably, non-party TransUnion accurately reported Plaintiff's public record bankruptcy filing and discharge based on the same information.

14

77.     Defendants knew or should have known that Plaintiff's bankruptcy was discharged.

78.     On Plaintiff's consumer disclosure, Experian and Equifax inaccurately reported Plaintiff's First Premier Bank account, ending with \*\*\*\*\*\*\*\*\*\*\*2925 and opened in September 2022 (the "'22 First Premier Account"), which pre-dated Plaintiff's bankruptcy filing.

79.     The '22 First Premier Account was discharged on or about March 18, 2025. Therefore, the '22 First Premier Account should have been reported as discharged in bankruptcy.

80.     Experian and Equifax inaccurately reported the '22 First Premier Account with a status of "Charge-Off" and a balance of $1,170.00 instead of a zero-dollar balance.

81.     Therefore, Experian and Equifax failed to indicate that the '22 First Premier Account was discharged in bankruptcy by reporting the pre-bankruptcy '22 First Premier Account with a status other than "Discharged/Included in Bankruptcy Chapter 7" and/or with a zero-dollar balance.

82.     Notably, the other national consumer reporting agency TransUnion did not inaccurately report the '22 First Premier Account like Experian and Equifax.

83.     Next, Experian and Equifax inaccurately reported Plaintiff's First Premier Bank account, ending with \*\*\*\*\*\*\*\*\*\*\*\*5775 and opened in February 2019 (the "'19 First Premier Account"), which pre-dated Plaintiff's bankruptcy filing.

84.     The '19 First Premier Account was discharged on or about March 18, 2025. Therefore, the '19 First Premier Account should have been reported as discharged in bankruptcy.

85.     Experian and Equifax inaccurately reported the '19 First Premier Account with a status of "Charge-Off" and a balance of $1,054.00 instead of a zero-dollar balance.

86.     Therefore, Experian and Equifax failed to indicate that the '19 First Premier Account was discharged in bankruptcy by reporting the pre-bankruptcy '19 First Premier Account with a status other than "Discharged/Included in Bankruptcy Chapter 7" and/or with a zero-dollar balance.

87.     Notably, the other national consumer reporting agency TransUnion did not inaccurately report the '19 First Premier Account like Experian and Equifax.

88.     The '22 First Premier Account, and '19 First Premier Account (collectively, the "Accounts") were all pre-bankruptcy debts that should have been reported as discharged.

89.     The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "Charge-Off."

90.     The national consumer reporting agencies specifically acknowledge that a "Charge-Off" generally means consumers are still legally responsible for paying the debt.

91.     According to Defendants, a charge-off means that a creditor has determined that an account is unlikely to be collected and has written it off as a loss for accounting purposes.

92.     Experian and Equifax inaccurately reported the Accounts as "Charge-Offs" after they were discharged in Chapter 7 Bankruptcy and with balances, instead of zero-dollar balances.

### Defendants' Unreasonable Procedures

93.     Defendants received information from First Premier Bank (the "Furnisher") indicating that Plaintiff's debts had been included in or discharged through bankruptcy, and/or that the Accounts had zero-dollar balances following the bankruptcy discharge.

94.     Nevertheless, Defendants rejected or otherwise overrode this information.

95.     Alternatively, Defendants knew from past experience that Furnisher had furnished inaccurate information regarding discharged debts, or have historically failed to implement reasonable procedures to ensure consumer debts are properly updated after a Chapter 7 bankruptcy.

96.     Additionally, upon information and belief, Lexis-Nexis also furnished information to Defendants that indicated Plaintiff had filed for bankruptcy and received a discharge, but Defendants rejected or otherwise failed to report the data they received.

97.     Furthermore, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Defendants through multiple sources such as PACER, but Defendants failed to review those sources or knowingly rejected them.

98.     Thus, Defendants blindly relied on the information provided by Furnisher, without verifying this information against readily available public records showing Plaintiff's bankruptcy and discharge.

99.     Therefore, Defendants' reliance on Furnisher was unreasonable.

100.    If not patently false/incorrect, Defendants' reporting of the Accounts is materially misleading and therefore inaccurate.

### Plaintiff's Disputes

101.    On or about August 01, 2025, Plaintiff mailed letters to Defendants disputing the inaccurate reporting in her consumer reports prepared by Defendants.

102.    The letters specifically advised Defendants that Plaintiff had filed for Chapter 7 bankruptcy in November 2024 and received a discharge in March 2025 and that her is no longer liable for the discharged debts.

103.    The letters included Plaintiff's name, date of birth, address, bankruptcy case number, and full Social Security number.

104.    Upon information and belief, Experian and Equifax received Plaintiff's dispute letters.

105.    Upon information and belief, Defendants each forwarded Plaintiff's dispute to Furnisher within 5 business days of receipt.

106.    Defendants failed to respond to Plaintiff's disputes.

107.    On October 6, 2025, Plaintiff pulled a new copies of her Experian and Equifax reports and observed that:

18

- Defendants were continuing to inaccurately report the '22 First Premier as charged-off and with a balance of $1,170.00.

- Defendants were continuing to inaccurately report the '19 First Premier as charged-off and with a balance of $1,054.00.

108.   Defendants did not investigate Plaintiff's disputes, and pursuant to their unreasonable procedures, merely forwarded an automated dispute form to Furnisher, despite possessing independent information that indicated the Accounts were discharged.

109.   Although Defendants could have verified that the Accounts were discharged through the same sources from which they receive consumer bankruptcy information, it neglected to do so.

110.   Rather than perform an investigation based on Plaintiff's dispute and reasonably available public records and information known by Experian and Equifax, Defendants merely parroted information furnished by Furnisher that indicated the Accounts were not discharged in bankruptcy.

111.   Defendants inaccurately reported inaccurate account statuses and/or payment histories.

112.   If not patently false, Defendants' reporting of the Accounts is materially misleading and therefore inaccurate.

**Plaintiff's Damages as a Result of Defendants' Reports**

113.   Plaintiff's DTI was negatively affected by Defendants' reporting of debts which Plaintiff does not owe, in turn negatively impacting Plaintiff's credit worthiness.

114.    After Plaintiff's bankruptcy discharge, on or around January 20, 2026, Plaintiff applied for a credit card with Citibank but was denied due to the aforementioned inaccurate reporting by Equifax.

115.    Additionally, on or around January 5, 2026, Plaintiff applied for a credit card with Credit One Bank but was approved at higher rates, a lower credit limit and/or worse overall terms due to the aforementioned inaccurate reporting by Experian.

116.    Defendants' inaccurate reporting of the aforementioned accounts, along with additional information belonging to Plaintiff, was published to potential creditors by Defendants during the process of Plaintiff's credit application.

117.    As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

118.    Plaintiff sustained actual monetary damages from the expense of mailing two dispute letters via regular mail to Defendants.

119.    As a direct result of Defendants' inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

120.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, violation of Plaintiff's right to privacy, and anxiety.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

121.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

122.     The FCRA requires CRAs, like Defendants, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

123.     Defendants negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after the consumer, Plaintiff, received a Discharge Order.

124.     Defendants know or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendants know or should have known of their obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

125.     These obligations are well established by the plain language of the FCRA, as promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendants from which Defendants are on notice of their unreasonable procedures concerning the reporting of discharged debts.

126.    Additionally, Defendants possess or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

127.    Despite knowledge of these legal obligations, Defendants willfully and consciously breached their known duties and deprived Plaintiff of her rights under the FCRA.

128.    Defendants know that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balances.

129.    In this case, Defendants regularly conduct voluntary public records searches with the intention of including bankruptcy information on the consumer reports they sell to other parties for a profit.

130.    Defendants received notice of Plaintiff's bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Defendants through sources of consumer information such as Lexis-Nexis, Defendants's own files, and information provided by data furnishers, yet Defendants rejected the information.

131.    Specifically, Defendants knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

132.    When Defendants received notice of Plaintiff's bankruptcy information, they had an obligation to ensure they reported Plaintiff's discharge and its effects with maximal accuracy.

133.    Defendants received notice of Plaintiff's bankruptcy discharge through public records, their own files, and information provided by data furnishers, yet Defendants failed to report Plaintiff's bankruptcy information.

134.    Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

135.    Alternatively, Defendants' violations of 15 U.S.C. § 1681e(b) were negligent.

136.    Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

137.    Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

138.    Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

139.    Defendants are direct and proximate causes of Plaintiff's damages.

140.    Defendants are substantial factors in Plaintiff's damages.

141.   Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq.*

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

142.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

143.   When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information or delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

144.   When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

145.   Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

146.   Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendants also violated the FCRA by failing

to perform a reasonable reinvestigation of the disputed accounts even after Plaintiff notified of the inaccurate information in Plaintiff's credit file.

147. Defendants' violations of 15 U.S.C. § 1681i include, but are not limited to the following:

a. Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

b. Failing to consider all relevant information while investigating Plaintiff's dispute.

c. Failing to include all relevant information when notifying Furnisher of Plaintiff's dispute.

d. Instead of reasonably reinvestigating Plaintiff's dispute, Defendants continued to report the Plaintiff's Accounts and public record information inaccurately after Plaintiff's bankruptcy discharge.

148. Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

149. Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

150. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

151. Defendants are individually a direct and proximate cause of Plaintiff's damages.

152.    Defendants are individually a substantial factor in Plaintiff's damages.

153.    Defendants' acts, as described above, were done willfully and knowingly; or, alternatively were committed negligently.

154.    Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.      Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681e(b);

ii.     Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681i;

iii.    An award of actual, statutory, and punitive damages as provided by the FCRA;

iv.     Awarding costs and reasonable attorneys' fees pursuant to FCRA 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

v.      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED on February 3, 2026

/s/ Adam Hubbi
Adam Hubbi, CA #359827
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1505
F: (480) 613-7733
E: ahubbi@consumerjustice.com